JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

### I. (a) PLAINTIFFS
ALASTAIR CROSBIE

### DEFENDANTS
HIGHMARK INC., HIGHMARK HEALTH OPTIONS AND GATEWAY HEALTH PLAN

**(b)** County of Residence of First Listed Plaintiff  Montgomery County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Allegheny County
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Bryan R. Lentz, Esq./Gavin P. Lentz, Esq./Peter R. Bryant, Esq.
Bochetto & Lentz, 1524 Locust Street, Phila., PA 19102

Attorneys *(If Known)*
Nina K. Markey, Littler Mendelson, 1601 Cherry Street, Suite 1400, Phila., PA 19102 - Atty. for Gateway Health Plan

### II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*
- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**
PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

PERSONAL INJURY
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**PRISONER PETITIONS**
Habeas Corpus:
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty
Other:
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☒ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

### V. ORIGIN *(Place an "X" in One Box Only)*
- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

### VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
31 USC 3730 (h)
Brief description of cause:
Plaintiff was retaliated against fo reporting violtion of False Claims Act

### VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $  IN EXCESS OF $500,000
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

### VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE
DOCKET NUMBER

DATE  3/22/19
SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**
RECEIPT #  AMOUNT  APPLYING IFP  JUDGE  MAG. JUDGE

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: __20 Dana Drive, Collegeville, PA 19426__

Address of Defendant: __120 Fifth Avenue Place, Pittsburgh, PA 15222/444 Liberty Avenue, Suite 2100, Pittsburgh, PA 15222__

Place of Accident, Incident or Transaction: _____

---

**RELATED CASE, IF ANY:**

Case Number: _____  Judge: _____  Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?   Yes ☐   No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?   Yes ☐   No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?   Yes ☐   No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?   Yes ☐   No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: __03/22/2019__       *Attorney-at-Law / Pro Se Plaintiff*        __71383__  *Attorney I.D. # (if applicable)*

---

**CIVIL:** (Place a √ in one category only)

A. *Federal Question Cases:*
☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Patent
☐ 6. Labor-Management Relations
☐ 7. Civil Rights
☐ 8. Habeas Corpus
☐ 9. Securities Act(s) Cases
☐ 10. Social Security Review Cases
☑ 11. All other Federal Question Cases
  *(Please specify):* __Retaliation Claim - 31 USC 3730 (h)__

B. *Diversity Jurisdiction Cases:*
☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify):* _____
☐ 7. Products Liability
☐ 8. Products Liability – Asbestos
☐ 9. All other Diversity Cases
  *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, __Bryan R. Lentz__, counsel of record or pro se plaintiff, do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought.

DATE: __03/22/2019__      *Attorney-at-Law / Pro Se Plaintiff*      __71383__  *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| ALASTAIR CROSBIE | : | CIVIL ACTION |
| v. | : | |
| HIGHMARK INC., HIGHMARK HEALTH OPTIONS and GATEWAY HEALTH PLAN | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.   ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.   ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.   ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)   ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.   ( X )

_3/22/19_   _[signature]_   Plaintiff
**Date**   **Attorney-at-law**   **Attorney for**
215-735-3900   215-735-2455   blentz@bochettoandlentz.com

**Telephone**   **FAX Number**   **E-Mail Address**

(Civ. 660) 10/02

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALASTAIR CROSBIE<br>20 Dana Drive<br>Collegeville, PA 19426<br><br>vs.<br><br>HIGHMARK INC.<br>Fifth Avenue Place<br>120 Fifth Avenue<br>Pittsburgh, PA 15222<br><br>And<br><br>HIGHMARK HEALTH OPTIONS<br>Fifth Avenue Place<br>120 Fifth Avenue<br>Pittsburgh, PA 15222<br><br>And<br><br>GATEWAY HEALTH PLAN<br>444 Liberty Avenue<br>Suite 2100<br>Pittsburgh, PA 15222 | CIVIL ACTION<br><br>NO.: |

## CIVIL ACTION COMPLAINT

**AND NOW** Comes Plaintiff, Alastair Crosbie, by and through his undersigned counsel, Bochetto & Lentz, P.C. ("B&L") and avers as follows in support of his claim for damages against Defendants:

# THE PARTIES

1. Plaintiff Alastair Crosbie ("Crosbie") is an adult individual residing at 20 Dana Drive, Collegeville, PA 19426.

2. Defendant Highmark Inc. ("Highmark") is a Pennsylvania Corporation which conducts business in the Eastern District of Pennsylvania, where it or its subsidiaries have contracted with thousands of individuals and companies to conduct such business in the Eastern District of Pennsylvania, with an address or operation including Fifth Avenue Place, 120 Fifth Avenue, Pittsburgh, PA 15222.

3. Highmark's website includes the following description:

> "Highmark Inc. and its health insurance subsidiaries and affiliates collectively are among the ten largest health insurers in the United States and comprise the fourth-largest Blue Cross and Blue Shield-affiliated organization. Highmark and its diversified businesses and affiliates operate health insurance plans in Pennsylvania, Delaware and West Virginia that serve five million members and hundreds of thousands of additional members through the Blue Card program. Its diversified businesses serve group customer and individual needs across the United States through dental insurance, vision care and other related businesses. Highmark is an independent licensee of the Blue Cross and Blue Shield Association, an association of independent Blue Cross and Blue Shield."

4. Defendant Highmark Health Options ("HHO") is a subsidiary of Highmark Inc. and was created for the specific purpose of acquiring the contract to act as the Managed Care Organization for Medicaid and Medical Assistance in locations including the state of Delaware.

5. Gateway Health Plan ("GHP") is a Pennsylvania Corporation with a corporate headquarters in the state of Alabama and a Pennsylvania address at 444 Liberty Ave, Suite 2100, Pittsburgh, PA 15222.

6. Plaintiff, Alastair Crosbie ("Crosbie") is a resident of the Eastern District of Pennsylvania. At all times material, Mr. Crosbie's paychecks were issued by Gateway, while his health benefits and corporate training were administered by Highmark.

7. GHP conducts substantial business in the Eastern District of Pennsylvania.

8. Gateways website includes the following description:

> "Gateway Health is a nationally-ranked managed care organization that focuses on providing the best possible healthcare to a growing number of Medicaid and Medicare Advantage consumers. A not-for-profit organization, Gateway Health serves the needs of at risk and vulnerable citizens with not only healthcare coverage, but services such as disease management, health and wellness programs and preventive care. The organization provides Medicaid services in Pennsylvania, Delaware, West Virginia and Arkansas, and Medicare coverage in Pennsylvania, Kentucky, Ohio and North Carolina. Our commitment to helping our members and their communities get and stay healthy is what keeps members, providers, communities and partners "Good with Gateway.""

## JURSDICTION AND VENUE

9. This action is brought by the United States under the federal False Claims Act, 31 U.S.C. § 3730 (h).

10. This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345.

11. This court has jurisdiction over the defendants pursuant to § 3732(a). All of the defendants reside and transact business in this district.

12. Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b)-(c), as defendants transact business in this district, and a substantial part of the events giving rise to this action occurred in this district.

# FACTS COMMON TO ALL COUNTS

13. Sometime prior to January 1, 2015, the state of Delaware Department of Human Services (DHS), Department of Medicaid & Medical Assistance (DMMA) approached Highmark (Delaware) Inc. and requested they submit an RFP to bid as a Managed Care Organization (MCO) DMMA programs.

14. The RFP required the MCO to be set up and operating by January 1, 2015.

15. Highmark Inc. formed a sub corporation identified as Highmark Health Options (HHO) in order to submit to RFP so that Highmark could generate additional revenue.

16. At that time, neither Highmark Inc. nor Highmark Health Options (HHO) had any prior experience in the management or oversight of Government funded healthcare management programs, including Medicaid specific programs.

17. Highmark had been strictly focused on private commercial funded programs, with a portion under tri-care type of management / Medicare programs Part C and D.

18. As a result, Highmark Inc. and HHO engaged GHP to manage the operations of the MCO contract.

19. The MCO was approved by Centers for Medicare and Medicaid Services (CMS).

20. When the contract with DMMA and HHO went live, on January 1, 2015, neither Gateway or HHO had established adequate mechanism to prevent fraud and ensure "Payment Integrity" as required by Federal Law.

21. Payment Integrity is a term of art used within the insurance industry to refer to internal mechanisms put in place to oversee payments and prevent fraud, waste or abuse.

22. Because HHO did not have an adequate payment integrity plan during 2015, the state of Delaware and DMMA placed HHO on a Corrective Action Plan known as a "CAP" with pending sanctions in early 2016.

23. In response to the CAP HHO took steps to establish a robust payment integrity department staffed with experts experienced in detecting and rooting out fraud.

24. Crosbie was specifically recruited and hired by Highmark Inc. on or about October 2016, to assist in establishing "best practices" for the Delaware HHO and for Highmark Inc.'s entire Payment Integrity department.

25. Crosbie was hired specifically because he had extensive experience in fraud investigations and compliance in the insurance industry.

26. In order to ensure payment integrity Crosbie and his colleagues had to conduct investigations of all aspects of HHO's operations that could impact the integrity of insurance payments utilizing state Medicaid funds.

27. One of the key areas of focus for Crosbie and his colleagues in payment integrity was the conduct and qualifications of doctors on an approved list of providers.

28. Approved providers were eligible to see Medicaid patients and receive reimbursement for legitimate treatments they provided.

29. Becoming an approved provider gave medical doctors and their practice access to millions of dollars in state and federal insurance funds.

30. In order to become an approved provider doctors had to complete an application process which includes a background check and "credentialing" or proof of professional qualifications.

31. The background check and credentialing process are both critical to fraud prevention because both are necessary to ensure that prohibited persons are not awarded contracts to treat Medicaid patients and receive reimbursement with government funds.

32. Immediately after he was hired, Crosbie and his colleagues in Payment Integrity began a comprehensive investigation of every aspect of the HHO operations in Delaware and Highmark in general.

33. This investigation identified multiple internal shortcomings in the operations Highmark Inc., HHO, GHP, as well as their approved providers as set forth more fully below.

### Dr. Zahid Aslam

34. Dr. Zahid Aslam was the owner of the following practices at the time of Crosbie's investigation:

   a. Fast Care Medical Group (d.b.a. Got A Doc) owns and operates approximately nine walk-in emergent care facilities within the state of Delaware. Phoenix Behavioral Health (2 locations which were absorbed under AMNA) are a mental health counseling centers utilized primarily in the treatment of addicted individuals.

   b. Phoenix Behavioral Health (2 locations which were absorbed under AMNA) are a mental health counseling centers utilized primarily in the treatment of addicted individuals.

   c. AMNA medical was a general medical practice, which included a very large population of members who were being treated for addictions. In fact, the 5 top prescribers of Suboxone in the entire state of Delaware were under Dr. Aslam's Practice. (Jean Brinkley (CRNP), Muhammad Farooq, David Jezyk, Hein Nguyen, Keith Sokoloff).

35. Each of these practices entered into contracts with Highmark Inc. as approved providers in the State of Delaware prior to the January 1, 2015 launch of HHO and GHP's role as the MCO for the state.

36. Dr. Aslam personally signed the contracts as owner of the provider groups.

37. During his investigation, Crosbie learned that Highmark Inc. executed contracts with Dr. Zahid Aslam before his credentialing was completed.

38. Delaware is a small state with limited providers in its more rural areas.

39. Because they did not have multiple providers available prior to January 2015, Highmark and HHO appeared to have skipped the credentialing process for Dr. Aslam's practices in order to expedite their contract and begin the MCO operation in Delaware.

40. In fact, Dr. Aslam's credentialing was not "skipped" -- instead, he had failed. Defendant's Highmark, HHO and GHP knew he had failed but moved forward with this joint business venture anyway

41. In January of 2014, Dr. Aslam entered into a Consent Order with the State of Maryland after being charged by the Maryland State Board of Physicians among other things "grossly overutilizing health care services" and "failing to meet the standard of quality care."

42. These charges in 2014 related to Dr. Aslam's failure to appropriately document his rationale for prescribing controlled dangerous substances.

43. This charge was particularly relevant to his credentialing by Highmark since a large percentage of the Medicaid eligible patients would be treating for addiction.

44. When he was asked to explain this consent order during his credentialing process Dr. Aslam provided no response.[1]

45. Despite this order in his history and his lack of response, Highmark approved the practices owned by Dr. Aslam for the Delaware MCO.

---

[1] "Dr. Aslam entered into a second Consent Order in the State of Maryland in July of 2016 during the time that his practices were contracted with Highmark. The second consent order resulted from Dr. Aslam not complying with the terms of the probation imposed by the Maryland State Board of Physicians as a result of his first consent order. Namely he had continued to prescribed controlled substances without proper documentation.

46. Crosbie's investigation confirmed that even though Dr. Aslam was personally prohibited from acting as a provider, Dr. Aslam continued to see Medicaid recipients and bill under the licenses of other doctors in the practice.

47. Crosbie also learned that Dr. Aslam was not the only member of the Aslam practices who was prohibited from treating Medicaid recipients.

48. AMNA medical, the general medical practice owned by Aslam, was among the top 5 prescribers of Suboxone in the entire state of Delaware.

49. Suboxone is frequently prescribed to treat individuals suffering from opioid addiction.

50. AMNA was staffed primarily by 5 medical providers: Jean Brinkley (CRNP), Muhammad Farooq, David Jezyk, Hein Nguyen, Keith Sokoloff.

51. Jean Brinkley and Keith Sokoloff both had prior convictions for "cash for scripts" scheme in the state of Delaware.

52. Cash for scripts is law enforcement short hand for a scheme to sell Oxy prescriptions for cash without any documented medical necessity (similar to what Dr. Aslam was accused of in Maryland).

53. Both Brinkley and Sokoloff were convicted of the crimes in connection with cash for scripts within the last 5-7 years.

54. As a result, like Dr. Aslam, neither could pass the credentialing process required to be an approved provider, but both were providing care and billing Medicaid under the HHO, GHP and MCO.

55. As early as June, 2017, Crosbie advised his superiors at Highmark, HHO and GHP of all of these facts about Dr. Aslam and his practices, on multiple occasions.

56. Persons advised by Crosbie include:

    a. HHO and GHP Management: Jim Burgess Sr. Director;

    b. HHO and GHP Chief Medical Officer, Greg Bush;

    c. Dwayne Parker COO Highmark Health Options;

    d. Dr. Greg Barclay Director of Behavioral Health;

    e. Ryan Kileen HHO Compliance Department; and

    f. Diana Rappa-Kesser VP Clinical Operations Highmark Health Options

57. In response to Crosbie's detailed reports with regard to Dr. Aslam the individuals above individually and collectively advised him that they could not cancel Dr. Aslam's contract because his practices filled a much-needed void in the addiction medicine arena in the state of Delaware.

58. They were concerned that if they acted on Crosbie's reports and excluded Dr. Aslam and his practices that they would be unable to find replacement practices and that the State of Delaware DMMA would determine that HHO and GHP had an inadequate network of providers and could not perform the MCO responsibilities.

59. This could in turn result in Highmark, HHO and GHP being sanctioned, and or their contract being cancelled or not renewed.

60. On March 15, 2018 Crosbie personally briefed Dwayne Parker -- the Highmark COO -- about the ongoing problems with Dr. Aslam and his practices.

61. This briefly included a description of the failed credentialing and the participation of prohibited person in the practices, and also concerns about fraud in provision of services.

62. Specifically, during emergent care treatment of patients, regardless of the presenting complaint, Dr. Aslam and his staff would identify Medicaid population members who had the symptoms of addiction to Heroin.

63. He or his staff would convince the patient to return to the practice for follow up treatment but when they returned would bill them under one of the addiction treatment practices, AMANA Medical (Medical), or Phoenix Behavioral Health (Mental Health).

64. Treatment for addiction requires a certified Substance Abuse and Mental Health Services Administration (SAMHSA, this can be a MD, PA, or CRNP).

65. SAMHSA's are limited to 275 patients per treating provider, 100 if a CRNP.

66. This treatment also requires a medical pre-authorization.

67. Crosbie confirmed during his investigation that Dr. Aslam was forging pre-authorizations by signing the name of other providers, since he was a prohibited person.

68. Through this scheme, Aslam and his practices were able to exceed the 275 patient cap.

69. Aslam and the providers in his practices also continued the same violations that he had committed in Maryland.

70. Crosbie's investigation established that Aslam's business model involved excessive gross "overutilizing of health care services" and excessive unjustified prescription of controlled dangerous substances.

71. In addition in order to maximize services and profits, Aslam billed for services performed by unqualified medical providers who either lacked proper credentials or were barred from providing certain services.

72. Crosbie also determined that Aslam was engaged in self referrals in violation of the Stark law.

73. Specifically, Aslam and providers at his businesses were prescribing unnecessary quantitative and qualitative test which were conducted by labs that Aslam also owned.

74. When Crosbie raised these issues during his briefing of Dwayne Parker in March 2018, Parker admonished him in front of Manager Paula Victoria and indicated HHO would not be addressing Dr. Aslam's contract with HHO because Dr. Aslam as an individual was not credentialed by HHO.

75. Crosbie responded that there had been an error committed by Highmark's credentialing team, and that medical practices owned by Aslam should never have been credentialed according to controlling Medicaid / Medicare Regulations.

76. Crosbie also emphasized that because of the charges in Maryland, Aslam could not be credentialed and that his medical practices should be scrutinized.

77. Parker expressed anger at Crosbie for continuing to press these issues.

78. In addition to reporting these activities to his upper management, Crosbie and his team also made a mandatory referral and cooperated with investigators from the Delaware Department of Justice Medicaid Fraud Control Unit (DE DOJ MFCU).

79. Crosbie made it clear to Parker and others in management on multiple occasions that there was an ongoing investigation into Aslam and his practices and that Crosbie was cooperating and assisting in that investigation.

80. Crosbie continued to press these issues despite being repeatedly rebuffed by Parker and others in management.

81. On each occasion, he was ignored, put off, or told nothing could be done.

82. In September of 2018, Crosbie made yet another presentation on Payment Integrity wherein he again reviewed the same issues with Aslam and his associated practices.

83. His reports were again greeted with hostile indifference.

84. Despite his persistent disagreement with management, Crosbie maintained a positive relationship with his immediate supervisors and always received superior performance evaluations.

85. He had never been disciplined or counseled for any deficient or inappropriate behavior.

86. Less than a month after his September briefing on payment integrity, Crosbie was abruptly fired from his job at Highmark/Gateway

87. The stated reason was an accusation by a co-worker (Elise Kroop) that he had allegedly made an inappropriate comment or noise but no specifics were provided to Mr. Crosbie at the time of termination.

88. Mr. Crosbie was shocked when he was terminated because he had previously raised a number of complaints with his employer about Elise Kroop actually harassing him.

89. By way of limited example, Mr. Crosbie notified the following individuals: (a) Diana Rappa Kesser, Vice President of Operations; (b) Brian Pici, a Manager at Gateway; (c) Jim Burgess, a Director at Gateway; (d) Jill Haer- at Gateway who was the manager for Elise Kroop; (e) Jodi Fletcher, Gateway Supervisor; (f) Chris Copeman, Director of long term care; and (g) Paula Victoria, Manager of provider relations at Gateway; Dwayne Parker of Highmark; Renee Licwinko Director of the Pharmacy was also aware of the complaints against Elise Kroop as she observed her behavior in the office

90. The information Crosbie included in his prior complaints about Elise Kroop included his belief that this employee, Elise Kroop, was stalking him and that she had engaged in similar improper activities at her prior employer.

91. Prior to being transferred to Gateway from Highmark, Elise Kroop was cited for improper behavior at Highmark as well yet she was never terminated.

92. Despite the fact that Crosbie had previously made multiple formal complaints that he had been harassed by this same employee, Highmark management did no investigation and fired Crosbie within hours of this single accusation.

93. Had they conducted an investigation, they would have learned that the accusation was false and that the accuser had a motive to lie since Crosbie had reported her to HR on multiple prior occasions for harassment and stalking.

94. Instead of doing an investigation, Highmark seized on the single false accusation that he made a noise that sounded like a pig so they fired him and used it as a pretense to terminate Crosbie and extinguish his efforts to bring the Aslam fraud to an end.

95. Defendants ignored his complaint about fraud and about being stalked by a co-worker but then fired him because he allegedly made a noise that the stalker allegedly found offensive.

96. At the time of Crosbie's termination Dr. Aslam and all of his practices were still on the approved providers list and still collecting millions of dollars in federal Medicaid dollars.

97. In November of 2018 the United States Attorney's office for the District of Delaware announced criminal charges against Dr. Aslam for among other things Healthcare Fraud.

98. The government alleged that Aslam's practice, Fast Care submitted claims to Medicare for services that falsely stated the services were rendered by a physician, when in many

cases the services were performed by a physician assistant, which is reimbursed by Medicare at a lower rate.

99. This fraudulent conduct was precisely the type that Crosbie complained of during his briefings of Parker and others.

100. The charges against Aslam resulted from the federal investigation that Crosbie assisted.

101. The same investigation that he advised Parker and others about during his briefings regarding Aslam.

## COUNT I

### UNLAWFUL RETALIATION IN VIOLATION OF SECTION 3730(h) OF THE FALSE CLAIMS ACT

102. Plaintiff repeats and incorporates each allegation contained in paragraphs above as if fully set forth herein.

103. 31 U.S.C. § 3730(h) provides as follows: Any employee, who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this Section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this Section, shall be entitled to all relief necessary to make the employee whole. Such relief shall include reinstatement with the seniority status such employee would have had but for the discrimination, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An employee may bring an action in the appropriate district court of the United States for the relief provided in this subsection.

104. Plaintiff's actions in reporting and cooperating in the investigation of fraud by Dr. Aslam was protected activity.

105. Defendants collectively retaliated against Plaintiff by terminating him based on a false accusation by another employee who they knew Crosbie had previously reported for harassment.

106. Defendants' agents and officer of Highmark, HHO and GHP participated in and approved of the retaliation against Plaintiff in order to silence his complaints and to avoid having to deal with the issues raised by the Plaintiff because doing so would cause the Defendant to lose revenue.

107. Defendants Highmark, HHO and GHP were motivated by financial gain in their decision to retaliate against Plaintiff and terminate him rather than acting to correct the illegalities reported by Mr. Crosbie.

108. Such retaliation was meant to conceal Defendants egregious actions in turning a blind eye to fraudulent activities of Aslam and silence Plaintiff.

109. Plaintiff' efforts to disclose and correct Defendant's violations of the FCA as described herein, were made in furtherance of protected activities under § 3730(h) of the FCA.

110. Defendants knew that Plaintiff was engaging in protected activities when he reported and cooperated in the investigation of Aslam's fraudulent activities.

**WHEREFORE,** Plaintiff respectfully requests this Court grant judgment in his favor and award the following damages against Defendants:

    (a) Awarding Plaintiff front pay and two times his back pay since his date of termination, plus interest on back pay calculated at the prime rate, compounded annually;

    (b) Awarding Plaintiff compensatory damages, including damages for emotional distress;

(c) Awarding Plaintiff punitive damages in an amount sufficient to deter defendants from committing such wrongful acts in the future;

(d) Awarding Plaintiff his reasonable attorneys' fees and costs;

(e) Such further relief as this Court deems equitable and just.

## JURY DEMAND

A Jury Trial is demanded on all issues.

BOCHETTO & LENTZ

*/s/ Bryan R. Lentz/*

BRYAN R. LENTZ, ESQUIRE
GAVIN P. LENTZ, ESQUIRE
PETER R. BRYANT, ESQUIRE
Attorney I.D.: 71383/53609/312328
1524 Locust Street
Philadelphia, PA 19102
215-735-3900
blentz@bochettoandlentz.com
glentz@bochettoandlentz.com
pbryant@bochettoandlentz.com

Date: 3/22/19