# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| ALSTAIR CROSBIE, | CIVIL ACTION |
|---|---|
| v. | |
| HIGHMARK, INC., HIGHMARK HEALTH OPTIONS, and GATEWAY HEALTH PLAN, | NO. 19-1235 |

Baylson, J.                                                                                            December 4, 2019

## MEMORANDUM

### I. Introduction

Plaintiff Alastair Crosbie is suing Highmark, Inc., Highmark Health Options ("HHO"; with Highmark, Inc., "Highmark Defendants"), and Gateway Health Plan for retaliating against Plaintiff in violation of the False Claims Act. According to his complaint, Defendants terminated Plaintiff because he opposed their working with a health care provider who was ineligible to receive reimbursements from federal funds.

Because the Highmark Defendants' and Gateway's Rule 12(b)(6) Motions to Dismiss present similar arguments, the Court will address both Motions together. The Motions present four basic issues:

- First, the Highmark Defendants argue they did not have an employer-employee relationship with Plaintiff. (Gateway admits to employing Plaintiff.)
- Second, all Defendants argue Plaintiff is not a protected "whistleblower" under the anti-retaliation provision of the FCA, because Plaintiff's complaint does not show Defendants could be subject to a viable FCA action.

- Third, all Defendants argue Plaintiff did not engage in conduct protected under the FCA anti-retaliation provision.

- Fourth, all Defendants argue that Plaintiff failed to put them on notice of any engagement in protected conduct.

- Fifth and finally, all Defendants argue Plaintiff did not establish a causal connection between his alleged protected conduct and subsequent termination.

For the reasons given below, Defendants' Motions to Dismiss will be DENIED.

## II. Factual and Procedural History

A. Factual History

Taking Plaintiff's allegations in the Amended Complaint as true,[1] and drawing all reasonable inferences in Plaintiff's favor, the facts are as follows. Highmark and its subsidiary corporation, HHO, contracted with Gateway to run a Managed Care Organization (MCO).[2] (Am. Compl. ¶¶ 13–18, ECF No. 17). To comply with federal integrity requirements,[3] Highmark and HHO established a "Payment Integrity" department, and Highmark hired Plaintiff, an "external" fraud expert, to investigate HHO's third-party medical service providers. Id. ¶¶ 22–25. Highmark

---

[1] The Court must confine its review to the Amended Complaint and disregard any differences between the Amended Complaint and the Original Complaint. West Run Student Housing Associates, LLC v. Huntington National Bank, 712 F.3d 165, 173 (3d Cir. 2013) (holding that district courts may not look outside the four corners of the amended complaint when resolving Rule 12(b)(6) motions).

[2] An MCO is a network of health care providers that makes its services available to individuals eligible for benefits under Medicare or Medicaid within the area served by the organization. 42 U.S.C. § 1396(m)(A)(A)(i).

[3] States that contract with an MCO must require MCOs to implement and maintain procedures designed to detect and prevent fraud and ensure all network providers are enrolled in the state consistent with screening requirements. 42 C.F.R. § 438.608(a). Among these safeguards, an MCO must designate a Regulatory Compliance Committee charged with overseeing the organization's compliance program and compliance under the contract with the State. §438.608(a)(1)(iii).

"administered" Plaintiff's health benefits and corporate training, while Gateway furnished his paychecks and, together with HHO, employed Plaintiff's immediate supervisors. Id. ¶ 6, 66–69.

Plaintiff's investigations uncovered defects in HHO's provider-credentialing system and identified a provider, Dr. Aslam, who was receiving Medicare/Medicaid reimbursements through Defendants despite not being an "Approved Provider."[4] Id. ¶¶ 36, 48, 65; see also id. ¶ 51. Only "Approved Providers" are eligible to see patients covered by Medicare/Medicaid and receive reimbursements for the services provided. Id. ¶¶ 31, 33.

Plaintiff reported this credentialing problem to his immediate supervisors and upper management. Id. ¶¶ 39, 41. After that failed, he "went outside his chain of command to report to upper management that both Gateway and Highmark were violating the False Claims Act by paying vendors who were prohibited from receiving federal funds." Id. ¶ 41; see also id. ¶¶ 71–75, 81. Plaintiff and his team also made "a mandatory referral" concerning Dr. Aslam's practices to the Delaware Department of Justice's Medicaid Fraud Control Unit and cooperated with investigators. Id. ¶ 104. Plaintiff made it clear to corporate management that he was cooperating and assisting in that investigation, and that the Defendants' conduct with regards to Dr. Aslam could subject them to FCA liability. Id. ¶ 105. Plaintiff was variously rebuffed, ignored, put off, or told nothing could be done, and the Defendants continued paying Dr. Aslam's practices. Id. ¶¶ 66, 72-75, 80, 106–107.

In September or October of 2018, Plaintiff "intensified" his "efforts to get other divisions of Highmark and Gateway to cease violating the False Claims [A]ct." Id. ¶¶ 108, 112, 114. That intensification included "more reports outside his chain of command and exceeding his job

---

[4] In order to be considered an "Approved Provider," physicians had to complete, among other conditions, a background check and credentialing. (Am. Compl. ¶ 33).

3

responsibilities by pressing the CCO and others to stop the fraud being committed in other divisions of the company." Id. ¶ 115.

Less than a week later, he was terminated after a coworker, Elise Kroop, accused him of directing a "noise that sounded like a pig" at her. Id. ¶ 112–114, 122. The allegation was made only hours prior to Plaintiff's termination.[5] Id. ¶ 120. This swift termination was quite different from Defendants' treatment of multiple harassment and stalking complaints he had made about Kroop. Id. ¶¶ 118–121.

B. Procedural History

Plaintiff filed the Original Complaint on March 22, 2019. (ECF No. 1). On May 22, 2019, Highmark and HHO, together, filed a Motion to Dismiss. (ECF No. 5). Two days later, Gateway separately filed a Motion to Dismiss Plaintiff's claim. (ECF No. 8). Plaintiff was granted leave to amend his Original Complaint on June 7, 2019. (ECF. No. 13). Plaintiff submitted an Amended Complaint on June 28, 2019. (ECF No. 17).

Plaintiff's Amended Complaint alleges his investigation of Dr. Aslam's fraud and reporting to upper management of a potential FCA violation constituted protected conduct under the FCA's anti-retaliation provision, and the Defendants knew he was engaged in such protected conduct. Id. ¶¶ 130, 135, 136. Plaintiff further alleges the basis for his firing, the purported harassment, was a mere pretext to conceal Defendants' retaliatory intent. Id. ¶¶ 131–134. On July 12, 2019, Defendants filed Motions to Dismiss Plaintiff's claim pursuant to Rule 12(b)(6). (ECF Nos. 18, 19). Plaintiff responded on August 9 (ECF Nos. 23, 24), and Defendants filed replies on August 23 (ECF Nos. 25, 26).

---

[5] Plaintiff's co-worker, Kroop, accused Plaintiff of directing a "noise that sounded like a pig" at her. Id. ¶ 122.

4

**III.     Legal Standard**

To survive a Rule 12(b)(6) motion, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The Court in Iqbal explained that, although a court must accept as true all of the factual allegations contained in a complaint, that requirement does not apply to legal conclusions; therefore, pleadings must include factual allegations to support the legal claims asserted. Iqbal, 556 U.S. at 678, 684. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678 (citing Twombly, 550 U.S. at 555).

**IV.     Discussion**

The FCA "whistleblower" provision "protects employees who assist the government in the investigation and prosecution of violations of the False Claims Act." Hutchins v. Wilentz, Goldman & Spitzer, 253 F.3d 176, 189 n.9 (3d Cir. 2001) (citing Neal v. Honeywell, 33, F.3d 860, 861 (7th Cir. 1994)). "[F]ew individuals will expose fraud if they fear their disclosures will lead to harassment, demotion, loss of employment or any other form of retaliation." Id. (quoting S. Rep. No. 99–345, at 34 (1986)). "Therefore, § 3730(h) broadly protects employees who assist the government in prosecuting and investigating False Claims Act violations." Id.

A plaintiff asserting a cause of action under § 3730(h) must show, *prima facie*, that (1) he engaged in "protected conduct," and (2) he was discriminated against because of his protected conduct. Hutchins, 253 F.3d at 189 n.9 (citing United States ex rel. Yesudian v. Howard Univ., 153 F.3d 731, 736 (D.C. Cir. 1998)). "Protected conduct" consists of "acts . . . in furtherance of a [False Claims Act] action . . . or other efforts to stop 1 or more violations of [the FCA]." 31 U.S.C. § 3730(h)(1). To show that an employer discriminated against an employee "because of" the

5

employee's protected conduct, an employee "must show that (1) his employer had knowledge he was engaged in 'protected conduct' and (2) his employer's retaliation was motivated, at least in part, by the employee's 'protected conduct.'" Hutchins, 253 F.3d at 189 n.9. Plaintiff has alleged sufficient facts to establish that he was employed by Defendants, engaged in protected conduct, and gave Defendants notice he was engaged in protected conduct, and that Defendants retaliated against him.

A. Employer-Employee Relationship

The allegations in Plaintiff's complaint are sufficient to establish that the Highmark Defendants had enough control over his every day activities to have had an employer-employee relationship[6] with him.

First, the Court must determine what test it should apply to determine whether Plaintiff was an employee, and whether that test allows for the possibility that all Defendants simultaneously had an employer-employee relationship with Plaintiff. The Court concludes that it should apply the Darden factors, described *infra*, which do allow for that possibility.

The Supreme Court instructs that, where Congress uses the word "employee" without defining it, courts should employ traditional common-law theories of the employment relationship. Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 322 (1992) (quoting Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 139 (1989)). The FCA does not define "employee," or in any way explain what factors courts should consider when evaluating whether a plaintiff is an "employee."

---

[6] Because Plaintiff can establish an employer-employee relationship with the Highmark defendants, the Court will not consider whether he could establish a contractor or agency relationship, although a "contractor, or agent" may also state a claim under the FCA anti-retaliation provision. See 31 U.S.C. § 3730(h)(1); cf. Trezza v. Soans Christian Acad., Inc., No. 18-cv-1626, 2019 WL 1359740, at *4 (E.D. Pa. Mar. 25, 2019) (Surrick, J.) (acknowledging that Third Circuit case holding that independent contractors could not state FCA anti-retaliation claims predated amendments to the FCA allowing suit by independent contractors).

Darden therefore applies. Moreover, the Third Circuit has applied the Darden factors to decide whether a plaintiff was an employee for the purposes of an FCA anti-retaliation claim. U.S. ex rel. Watson v. Conn. Gen. Life Ins. Co., 87 Fed. App'x 257, 261–63 (3d Cir. 2004); see also Trezza, 2019 WL 1359740, at *4 ("[T]he Third Circuit's adherence to the Darden factors to consider the contours of the employment relationship for purposes of FCA retaliation claims remains good law.").

Where a plaintiff alleges an employer-employee relationship with two different entities, "the inquiry under Darden is not *which* of [the] two entities should be considered the employer of the person in question." Faush v. Tuesday Morning, Inc., 808 F.3d 208, 215 (3d Cir. 2015). Instead, the Darden factors are applied to each entity separately. See id. at 215–18. This is because Darden recognizes that person can be employed by two entities simultaneously, see id. (citing Graves v. Lowery, 117 F.3d 723, 727 (3d Cir. 1997)), as was true at common law, id. (quoting Williamson v. Consol. Rail Corp., 926 F.2d 1344, 1349 (3d Cir. 1991)).

To summarize: the Third Circuit recognizes that an employee can have multiple employers under Darden, as at common law. Id. at 215. And the Third Circuit applies the Darden factors in FCA anti-retaliation claims. Watson, 87 Fed. App'x at 257, 261–63. It follows that, under current Third Circuit law, a plaintiff can have multiple employers for the purposes of an FCA anti-retaliation case.

Having determined that Darden applies and allows for the possibility that all Defendants had an employer-employee relationship with Plaintiff, the Court must apply the Darden factors. Under Darden, courts should consider, among other factors: the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; the provision of employment benefits; and the tax treatment of the hired party.

7

Nationwide Mut. Ins. Co., 503 U.S. at 323–24 (quoting Cmty. for Creative Non-Violence, 490 U.S. at 751–52). No single Darden factor is controlling. Id. at 324 (quoting N.L.R.B. v. United Ins. Co. of Am., 390 U.S. 254, 258 (1968)). In applying the Darden factors, the Third Circuit has "generally focused on 'which entity paid the employees' salaries, hired and fired them and had control over their daily employment activities.'" Faush, 808 F.3d at 214.

Faush illustrates the circumstances under which a worker could maintain an employer-employee relationship with two collaborating business enterprises. Faush, the plaintiff, was employed by Labor Ready, a staffing firm that provides temporary employees to several clients, including defendant Tuesday Morning. Faush, 808 F.3d at 201. Labor Ready assigned Faush to work for Tuesday Morning. Id. at 210. Tuesday Morning was responsible for supervising and directing Faush's work and providing any necessary safety orientation and training. Id. Also, Tuesday Morning was expected to determine whether Faush met its skill, competency, and experience requirements. Id. at 211. Although Tuesday Morning did not have the authority to fire Faush from Labor Ready, its manager had the authority to request that Faush not be allowed to return to its own store. Id. Tuesday Morning shared payment responsibilities with Labor Ready by paying Labor Ready for each hour worked by the plaintiff and determining the rates charged per hour. Id. at 212. The plaintiff filed suit against defendant claiming violations of Title VII. Id. The Third Circuit concluded that the record contained sufficient evidence for a jury to find that the plaintiff had an employer-employee relationship with Tuesday Morning as well as its employer-employee relationship with Labor Ready. Id. at 215.

As Plaintiff has alleged them, the facts of this case are similar. Like Tuesday Morning, who was responsible for supervising and directing the Faush plaintiff's activities, HHO allegedly employed many of the managers who supervised and evaluated Plaintiff, enabling them to regulate

8

Plaintiff's daily work activities. On the facts alleged, Highmark's power to fire Plaintiff appears to exceed Tuesday Morning's power to terminate Faush. Tuesday Morning could only prevent Faush from working for it; it could not terminate his relationship with Labor Ready. Highmark, by contrast, was able to end Plaintiff's employment with all three Defendants. (Highmark also recruited and hired Plaintiff.) Finally, in Faush, while Labor Ready directly paid Faush's wages, Tuesday Morning indirectly paid his wages by funding Labor Ready for any services provided. Id. at 216. In this case, Plaintiff alleges that while Gateway paid his salary, Highmark administered his health benefits and training.

Based on the facts in the complaint, the Highmark Defendants' relationship to Plaintiff is comparable to that of Tuesday Morning in Faush. Accordingly, Plaintiff has pleaded an employer-employee relationship with the Highmark Defendants.

B. Underlying FCA Liability

To bring an FCA anti-retaliation claim, a plaintiff must allege facts that could "reasonably lead to a viable FCA case." Dookeran v. Mercy Hosp. of Pittsburgh, 281 F.3d 105, 108 (3d Cir. 2002). Here, Plaintiff has done so.

To violate the FCA, a person must knowingly present, or cause to be presented, a false or fraudulent claim for payment. 31 U.S.C. § 3729(a)(1)(A). A false or fraudulent claim is made either by express or implied false certification of compliance. U.S. ex rel. Wilkins v. United Health Grp., Inc., 659 F.3d 295, 305 (3d Cir. 2011) (citing Conner v. Salina Reg'l Health Ctr., Inc., 543 F.3d 1211, 1217 (10th Cir. 2008)). An "implied false certification" occurs if "a claimant seeks and makes a claim for payment from the Government without disclosing that it violated regulations that affected its eligibility for payment." Id. The implied misrepresentation of compliance must

be material to the government's decision to pay in order to create FCA liability. Universal Health Servs., Inc. v. U.S. ex rel. Escobar, 136 S. Ct. 1989, 2001 (2016).

Plaintiff alleges Defendants violated the FCA by continuing to pay Dr. Aslam's practices, despite knowing that he was a prohibited provider, and subsequently billing Medicare and Medicaid for his practices' services. Defendants respond that even if every word of the Amended Complaint were true, it would not demonstrate that they made any misrepresentation to the Government. (Gateway Mot. Dismiss at 14; Highmark Mot. Dismiss at 17). The Highmark Defendants argue in the alternative that any misrepresentation was not material to the government's decision to pay their MCO, because the MCO was paid on a "capitated" basis in which reimbursement amounts remained constant regardless of the amount of services claimed.[7] (Highmark Mot. Dismiss at 18).

Plaintiff has alleged a reasonably viable theory of Defendants' underlying FCA liability. In the Third Circuit, a plaintiff can state an FCA claim by alleging that a defendant "submitted claims for payment to the Government at a time that they knowingly violated a law, rule, or regulation which was a condition for receiving payment from the Government." Wilkins, 659 F.3d at 313. Here, Defendants were allegedly billing Medicare and Medicaid for services while operating without the required number of adequately-credentialed healthcare providers. Indeed, they were "concerned that if they . . . excluded Dr. Aslam and his practices . . . the State of Delaware DMMA would determine that HHO and Gateway had an inadequate network of providers and could not perform the MCO responsibilities. This could result in Highmark, HHO and Gateway['s] . . . contract being cancelled or not renewed." Am. Compl. ¶¶ 77–78. Plaintiff

---

[7] This fact, which does not appear in the pleadings, may not be properly before the Court. However, since the Court will reject the Defendants' argument regardless, the Court will accept it *arguendo*.

alleges, in other words, that Defendants billed the Government for services while aware that their MCO suffered from compliance issues that could have resulted in the cancellation or nonrenewal of their contract.[8] This may be sufficient for Plaintiff to state an FCA claim. See Wilkins, 659 F.3d at 313. Plaintiff's complaint therefore presents a reasonably viable theory of underlying FCA liability for the purposes of the Motions to Dismiss.

At this stage, the Court cannot conclude that the Plaintiff has no viable theory of underlying FCA liability simply because Defendants received capitated payments. "The materiality inquiry does not ask whether *the cost* of a noncompliant item would have affected the Government's payment decision; it asks whether *the noncompliance itself* would have affected that decision." United States ex rel. Simpson v. Bayer Corp., 376 F. Supp. 3d 392, 411 (D.N.J. 2019) (Linares, C.J.); see also Wilkins, 659 F.3d at 312 (allowing FCA claim to proceed where "[e]ach month . . . United Defendants certify to CMS its continued compliance with all of the CMS MA Guidelines and based on such certification, United Defendants continues [sic] to receive the monthly capitation payments" (alterations in original)). The fact that the government reimburses Defendants' Approved Providers based on a capitation agreement with fixed payments, therefore, does not preclude a false certification from being a material fact. "[T]he Government suffers a loss every time it pays a noncompliant claim that it need not pay." Simpson, 376 F. Supp. 3d at 410. Here, Plaintiff alleges that Defendants' MCO contract might have been cancelled or not renewed had their underlying credentialing problems been exposed. Presumably, had Defendants' contract been cancelled or not renewed, the Government would not have needed to pay their

---

[8] Defendants also argue that Plaintiff's failure to allege any particular false claim occurred is fatal to his complaint. (Gateway Mot. Dismiss at 13; Highmark Mot. Dismiss at 17). While the Third Circuit has granted motions for summary judgment based on a plaintiff's failure to identify a single particular claim for payment to the government, it has not applied the same level of specificity at the pleading stage. Wilkins, 659 F.3d at 308. Plaintiff's allegations are sufficient at this stage.

11

claims. The alleged violations could, therefore, be fond material despite any capitated payment arrangement. Plaintiff's theory of underlying FCA liability is valid.

C. Protected Conduct

Having concluded that the Plaintiff's theory of underlying FCA liability is valid, the Court must consider whether the Plaintiff has plausibly alleged that he engaged in protected conduct. He has.

The whistleblower provision protects two categories of acts: (1) employees' "lawful acts . . . in furtherance of an [FCA] action," and (2) employees' "lawful acts . . . in furtherance of . . . other efforts to stop 1 or more [FCA] violations."[9] 31 U.S.C. § 3730(h)(1). While the first category requires a nexus between the employee's conduct and a potential FCA action, the second category "focuses on the whistleblower's 'efforts to stop' violations of the statute before they

---

[9] The second category is a latecomer, adopted only in 2009 through an amendment to the FCA. United States ex rel. Reed v. KeyPoint Gov't Sols., 923 F.3d 729, 765–66 (10th Cir. 2019). There is a dearth of Third Circuit caselaw concerning it. However, many other circuits have addressed it. E.g., Singletary, D.V.M. v. Howard Univ., 939 F.3d 287 (D.C. Cir. 2019); Reed, 923 F.3d at 729; United States ex rel. Grant v. United Airlines, Inc., 912 F.3d 190 (4th Cir. 2018); United States ex rel. Chorches v. Am. Med. Response, Inc., 865 F.3d 71 (2d Cir. 2017); United States ex rel. Booker v. Pfizer, Inc., 847 F.3d 52 (1st Cir. 2017); Halasa v. ITT Educ. Servs., Inc., 690 F. 3d 844 (7th Cir. 2012). The Court can see no reason that the Third Circuit would not similarly give due regard to the 2009 amendment. Cf. United States ex rel. Petratos v. Genentech, Inc., 855 F.3d 481, 491 (3d Cir. 2017) (applying rule against surplusage). The Court, therefore, will treat these out-of-circuit cases as persuasive authority.

Many Circuits have agreed that the second category expands the protections available under the FCA's anti-retaliation provision. E.g., Singletary, 939 F.3d at 296; Reed, 912 F.3d at 765; Grant, 912 F.3d at 201; Chorches, 865 F.3d at 97. A partial exception is the First Circuit, which interpreted the FCA's anti-retaliation provision to protect "other efforts" even before the amendment. Booker, 847 F.3d at 59 n.8. In other words, the amendment did not expand the reach of the FCA's anti-retaliation provision within the First Circuit only because the First Circuit already interpreted the provision so broadly. Id.

The Court recommends that the Plaintiffs consider proceeding under the second category as this case continues.

happen or recur." Singletary, 939 F.3d at 295–96 (citing Grant, 912 F.3d at 201). Nonetheless, "the plaintiff's actions . . . must still have a nexus to an FCA violation." Grant, 912 F.3d at 202; Reed, 923 F.3d at 767; Booker, 847 F.3d at 59 n.8.

Plaintiff's allegations that he reported to management, in violation of his ordinary reporting structure, about the possibility that Defendants were submitting false claims allege protected efforts to stop FCA violations. Alerting management to the possibility that the company is submitting false claims may constitute a protected effort to stop FCA violations. E.g., Grant, 912 F.3d at 202; Halasa, 690 F.3d at 848; Chotas v. Area Storage & Transfer, Inc., No. 1:14-cv-0084, 2014 WL 2619374, at *5 (M.D. Pa. June 12, 2014) (Rambo, J.). Here, Plaintiff alleges that he worked assiduously to warn various members of Defendants' management (both inside and outside of his ordinary reporting structure) that Defendants were exposing themselves to liability by working with Dr. Aslam's practices. He alleges that he persisted despite being rebuffed, ignored, and told to "let it go." And he also alleges that he warned management that he was cooperating with an actual government investigation into Dr. Aslam's practices. The FCA protects the conduct alleged.

Plaintiff's alleged cooperation with government investigators also constituted protected efforts to stop FCA violations. Notifying the government of potential fraud and then cooperating with an investigation may constitute protected activity. Drumm v. Triangle Tech, Inc., Case No. 4:15-CV-854, 2016 WL 6822422, at *7 (M.D. Pa. Nov. 18, 2016). Plaintiff alleges that he did both. Although the possible fraud was a third party's, the Court understands from Plaintiff's complaint that he believed the third-party fraud was inculpatory as to Defendants as well. As discussed earlier, for the purposes of these Motions to Dismiss, that belief was reasonable. Therefore, again, the FCA protects the conduct alleged.

Plaintiff has met any heightened pleading burden that his job in fraud prevention may entail in an FCA anti-retaliation case. Plaintiffs alleging retaliation against acts "in furtherance of" potential FCA actions have a heightened pleading burden to demonstrate that they engaged in protected conduct when that alleged protected conduct overlaps with their ordinary job description, see Hutchins, 253 F.3d at 191, but the Third Circuit has not explained whether this heightened burden applies to plaintiffs alleging retaliation based on "other efforts" to stop FCA violations. The Court assumes without deciding that Plaintiff must meet the heightened burden.

The Court concludes that Plaintiff's pleadings meet the heightened burden. The Court mainly reaches that conclusion by comparing Plaintiff's conduct to that of the plaintiff in Hutchins. In Hutchins, there was no evidence that the plaintiff "engaged in any conduct, beyond what was specifically asked of him in accordance with his job duties," or that made it apparent that the plaintiff considered the defendant's conduct a potential source of FCA liability. Here, by contrast, the Plaintiff alleges that he specifically told upper management, including managers outside his ordinary reporting structure,[10] that their practices put them at risk under the FCA. Moreover, he persisted despite management reactions ranging from indifference to opposition. Cf. Reed, 923 F.3d at 729 (quoting Schweizer, 677 F.3d at 1239). Plaintiff has sufficiently alleged that he engaged in protected conduct.

---

[10] Both Defendants rely on the Tenth Circuit case United States ex rel. Reed, 923 F.3d at 770, for the proposition that Plaintiff must plead facts "defining the scope of h[is] duties such that [the Court] could discern with some specificity the contours of [his] chain of command or ordinary reporting structure related to fraud matters" to defeat the presumption that he was acting within the scope of his ordinary duties. (Gateway Mot. Dismiss at 10–11; Highmark Mot. Dismiss at 14). However, Reed also acknowledged that a plaintiff's persisting despite opposition indicates that he or she is violating their ordinary reporting structure. Reed, 923 F.3d at 729 (quoting U.S. ex rel. Schweizer v. Oce N.V., 677 F.3d 1228, 1239 (D.C. Cir. 2012)). Here, Plaintiff has pleaded that he persisted despite being rebuffed, ignored, and told to stop. At this stage, the Court can reasonably infer that Plaintiff violated his chain of command or ordinary reporting structure.

D. Notice of Protected Conduct

On the facts alleged, Defendants had notice of Plaintiff's protected conduct. Allegations in a complaint that an employee warned his or her employer that the employer was out of compliance with conditions on the receipt of federal funds allow the reasonable inference that the employer had notice. See Singletary, 939 F.3d at 302. The plaintiff in Singletary, a veterinarian at Howard University, made "repeated statements to higher-ups that the animals' housing conditions . . . violated the promises made (and being made) to obtain federal funding." Id. The D.C. Circuit concluded that at the motion-to-dismiss stage, it was a "reasonable inference that Howard University knew that she was concerned about putting a stop to misrepresentations and material omissions in the University's grant filings with the government." Id. Here, Plaintiff alleges that he repeatedly warned his employers that the MCO was out of compliance with federal requirements due to its association with Dr. Aslam's practices. He allegedly also warned his employers that he was cooperating and assisting with a related government investigation. The Court can infer that his employers were on notice.

Plaintiff has met any heightened pleading burden that his job in fraud prevention may entail in an FCA anti-retaliation case. As with protected conduct, the Third Circuit has held that plaintiffs whose ordinary job duties include fraud prevention or compliance have a heightened pleading burden to show notice in FCA anti-retaliation suits alleging acts "in furtherance of" an FCA suit, Hutchins, 253 F.3d at 191, but it has not ruled on whether this heightened burden applies to plaintiffs alleging retaliation based on "other efforts" to stop FCA violations. Other circuits have held or acknowledged that some heightened burden survived the FCA amendments. See Singletary, 939 F.3d at 301–02; Reed, 923 F.3d at 768. The Court again assumes without deciding that Plaintiff must meet the heightened burden.

15

The Court, again, concludes that Plaintiff has by comparing Plaintiff's conduct to that of the plaintiff in Hutchins. In Hutchins, the Third Circuit concluded that there was no notice of the alleged protected conduct. Id. at 193. The Hutchins plaintiff did not ever "allege fraud, illegality or a potential False Claims Act suit" or tell his employer that "he was going to report [the alleged fraud] to government authorities." Id. In fact, it does not appear that the Hutchins plaintiff ever reported that he thought his employer was engaged in illegal or fraudulent conduct. Id. at 193–94. Here, Plaintiff alleges that he specifically told upper management that their practices put them at risk under the FCA, that he had reported related discoveries to the government, and that he planned to cooperate with a related government investigation. Although the government reporting concerned a third party's possible fraud, Plaintiff's alleged extensive internal reporting may have alerted the Defendants that Plaintiff considered that possible fraud inculpatory as to Defendants. The government investigation of the third party, therefore, could have provided Defendants further notice that Plaintiff was responding to what he understood to be a source of FCA liability. This alleged conduct should have put Defendants on notice that Plaintiff was engaged in protected conduct.

Singletary, 939 F.3d at 287, also provides useful guideposts. The Singletary plaintiff repeatedly bypassed her chain of command and was rebuffed. See 939 F.3d at 302. The court in that case considered that evidence that the defendant had notice of her protected conduct. Id. at 302. Plaintiff pleads similarly. The Singletary plaintiff also directly notified the government of her employer's possible fraudulent conduct and informer her superiors of the same. See id. at 294, 303. Again, the court concluded that this demonstrated notice. See id. at 294, 303. Plaintiff, too,

16

alleged directly notified the government of possible fraud and informed his superiors of the same. In short, Plaintiffs' allegations would overcome any heightened pleading burden.[11]

Finally, the Court can infer that whoever terminated Plaintiff (allegedly acting on Defendants' behalf) had notice of his protected conduct. Defendants argue that Plaintiff has failed to meet a requirement to plead that the specific supervisor(s) who decided to terminate him were aware of his protected conduct. (Gateway Mot. Dismiss at 16–17; Highmark Mot. Dismiss at 21 (citing Morris v. Phila. Hous. Auth., No. Civ.A. 10-5431, 2011 WL 1661506, at *4 (E.D. Pa. Apr. 28, 2011) (Baylson, J.) (citing Ambrose v. Twp. of Robinson, 303 F.3d 488, 493 (3d Cir. 2002)))). At this stage, the Court can reasonably infer from Plaintiff's allegations that whoever terminated Plaintiff was generally aware of his course of protected conduct, which allegedly lasted over a year, included reports to many members of management inside and outside his direct chain of command, and involved other members of his team and a government investigation.

Based on the allegations in the Amended Complaint, Defendants had notice of Plaintiff's protected conduct.

---

[11] Defendants direct the Court's attention to several other district court cases to show that they could not have had notice of Plaintiff's alleged protected conduct. Even if the Court concluded that these cases were factually analogous, they would be distinguishable. All of those cases, even those that postdate the 2009 FCA amendments, were decided under the "in furtherance of" prong of the FCA's anti-retaliation provision. See Wagner v. Catalent Pharm. Sols., LLC, Civil Action No. 3:18-cv-10065, 2019 WL 1746308, at *5 (D.N.J. Apr. 18, 2019) (Sheridan, J.); United States ex rel. Cannon v. Rescare, Inc., Civ. No. 09-3068, 2012 WL 12899103, at *2 (E.D. Pa. Feb. 10, 2012) (Diamond, J.); Mahoney v. Universal Pediatric Servs., Inc., 753 F. Supp. 2d 839, 847 (S.D. Iowa 2010) (Gritzner, J.), aff'd, 643 F.3d 1103 (8th Cir. 2011); United States ex rel. Bartlett v. Tyrone Hosp., Inc., 234 F.R.D. 113, 129 (W.D. Pa. 2006) (Gibson, J.); United States ex rel. Scott v. Metro. Health Corp., 375 F. Supp. 2d 626, 646 (W.D. Mich. 2005) (Enslen, J.). Because they all addressed notice of acts "in furtherance of" FCA lawsuits brought by relators, they do not speak to notice of efforts to stop FCA violations short of *qui tam* actions.

E.  <u>Causal Connection Between Protected Conduct and Termination</u>

Plaintiff pleaded sufficient facts to establish a causal connection between his alleged "protected conduct" and subsequent termination. An FCA anti-retaliation plaintiff can prove discrimination "because of" protected conduct by showing that his or her employer's knowledge of his or her protected conduct at least partially motivated the adverse employment action they suffered. <u>Hutchins</u>, 253 F.3d at 186. A plaintiff may present a variety of types of evidence, such as temporal proximity between protected activity and retaliatory action, or other evidence of illegitimate motivation. Claire M. Sylvia, The False Claims Act: Fraud Against the Government § 5:25 (May 2019 ed.).

The Court can infer causation, for the purposes of these Motions only, from the temporal proximity between Plaintiff's alleged protected conduct and his subsequent termination. In the Third Circuit, an interval as long as one week between the exercise of protected rights and the alleged retaliation may allow an inference of causation, even at summary judgment. <u>Lichtenstein v. Univ. of Pittsburgh Med. Ctr.</u>, 691 F.3d 294, 307 (3d Cir. 2012). Here, Plaintiff allegedly was terminated only five days after he "intensified" protected reports about Defendant's potentially fraudulent conduct. That is enough to survive the Motions to Dismiss. At this stage, the gap between the beginning of Plaintiff's course of protected conduct and his eventual termination is not controlling. The Court can reasonably infer from the Amended Complaint that the Defendants were prepared to tolerate Plaintiff's conduct up to a point, but that his intensified reporting pushed the Defendants' tolerance past the breaking point and caused his termination. Plaintiff has therefore pleaded a causal connection based on temporal proximity.

The allegedly questionable grounds for Plaintiff's termination provides further grounds for the Court to infer causation at this stage. Plaintiff alleges that the sexual harassment complaint

was made only hours prior to his termination, and that Defendants undertook little-to-no investigation of the complaint even though he consistently received positive performance reviews from his immediate supervisors. He also alleges that Defendants' swift decision to terminate him was quite different from their failures to respond to his own previous complaints about the complainant. As alleged, the alleged circumstances of Plaintiff's termination support an inference of retaliatory motive and, therefore, causation.[12]

## V.    Conclusion

For the reasons discussed above, Defendants' Motions to Dismiss will be DENIED. An appropriate order follows.

O:\CIVIL 19\19-1235 Crosbie v. Highmark\19cv1235 MtD Memo.docx

---

[12] The Court rejects the Highmark Defendants' argument that there was no causation because the Amended Complaint suggests a gap between the recipients of Plaintiff's protected reports and those with the power to fire him. Highmark argues that because Plaintiff only informed those "*outside of his reporting chain* that Defendants allegedly engaged in fraud (as opposed to fraud committed by Dr. Aslam)," Plaintiff's reports could not have inspired Defendants to terminate him. (Highmark Mot. Dismiss at 21) (emphasis added). Assuming that this is even a fair reading of the Amended Complaint, the Court disagrees. The Court may reasonably infer that managers in Plaintiff's immediate reporting structure became aware of Plaintiffs' reports of fraud even though those reports were presented to others outside of his immediate reporting structure. Alternatively, the Court may reasonably infer that some member of management who was outside Plaintiff's immediate reporting structure directed Plaintiff's firing for retaliatory reasons.