IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| ALASTAIR CROSBIE<br><br>v.<br><br>HIGHMARK INC., HIGHMARK HEALTH OPTIONS, AND GATEWAY HEALTH PLAN | CIVIL ACTION<br><br>NO. 19-1235 |
|---|---|

MEMORANDUM RE: MOTIONS FOR SUMMARY JUDGMENT

Baylson, J.                                                                                                    March 9, 2021

**I.      Introduction**

Plaintiff Alastair Crosbie was a healthcare fraud investigator who formerly worked for Defendants,[1] who operated a Medicaid organization for the State of Delaware. During one of his investigations, he discovered that Defendants were working with an uncertified healthcare provider, and Crosbie began reporting what he believed to be potential False Claims Act liability to his supervisors. Crosbie was terminated. He sued Defendants on the belief that they fired him in retaliation for his FCA complaints.

Between this internal FCA reporting and his termination, however, Defendants' human resources team received and investigated complaints that Crosbie was harassing a coworker. Defendants have asserted these HR professionals made the decision to fire Crosbie had no knowledge of his FCA-related concerns, and the termination decision was unrelated to Crosbie's FCA concerns. Because Crosbie has failed to identify any evidence that the harassment investigation was a pretext, the Court will GRANT Defendants' motions for summary judgment.

---

[1] The term "Defendants" refers to Highmark Inc. and Highmark Health Options (together, "Highmark") and Gateway Health Plan ("Gateway").

1

## II.     <u>Factual Contentions</u>

The following facts are drawn from the parties' statements of undisputed material facts and their responses to the other parties' statements. In adjudicating these motions for summary judgment, the Court relies on undisputed facts and, where disputed, record-based facts and justifiable inferences most favorable to the non-moving party (Crosbie). <u>Barefoot Architect, Inc. v. Bunge</u>, 632 F.3d 822, 826 (3d Cir. 2011).

Highmark is a managed care organization that contracts with the State of Delaware to provide insurance services for Medicaid-eligible residents. ECF 49-1 ("Highmark Br.") at ¶ 2. Gateway, in turn, was a contractor for Highmark, providing various support services including Payment Integrity. <u>Id.</u>

Defendants hired plaintiff Alastair Crosbie as a Senior Fraud Analyst in October 2016. <u>Id.</u> at ¶ 1. As a Senior Fraud Analyst, Crosbie had job duties that included investigating and reporting on fraud, waste, and abuse throughout the insurance network. <u>Id.</u> at ¶ 5. These investigatory duties included some False Claims Act review of payments. <u>Id.</u> Crosbie reported to Edward Pici, who reported to Jim Burgess. <u>Id.</u> at ¶ 6. Pici and Burgess considered Crosbie to be a good employee during his tenure. <u>Id.</u> at ¶ 11.

    a)   <u>FCA Investigation</u>

Beginning in December 2016, Crosbie began investigating Dr. Zahid Aslam, a doctor who worked with entities that had insurance claims processed through Highmark. <u>Id.</u> at ¶¶ 12–14. Aslam was arrested in or by June 2017. <u>Id.</u> at ¶ 13. In September and October 2017, Crosbie informed his superiors (including Pici and Burgess) that Aslam was not a "participating provider" yet had been signing contracts on behalf of multiple entities that operated as participating providers. <u>Id.</u> at ¶¶14–16.

Crosbie was concerned that Aslam did not have the proper credentials to authorize these contracts and that Highmark had a duty under the False Claims Act to report these "irregularities" to the Delaware government. Id. at ¶ 16. And Crosbie began reporting this potential liability to Defendants' employees, both in and out of his direct line of supervision throughout the next year. Id. at ¶¶ 23–25, 33. This included Burgess. Id. at ¶ 33.

    b) <u>Harassment Complaint and Investigation</u>

Meanwhile, on October 1, 2018, Elyse Kropp, one of Crosbie's co-workers, made a complaint to Human Resources about Crosbie. Id. at ¶ 35. Kropp complained that Crosbie had made pig noises at her and called her "Miss Piggy" in reference to her weight. Id. Crosbie denies both. ECF 56-1 ("Crosbie Br.") at ¶ 35.

Diana Vodzak was the Human Resources employee who received and investigated the complaint. Highmark Br. at ¶¶ 35, 36.[2] Vodzak did not know Kropp and had met Crosbie only once. Id. at ¶ 37. The same day as receiving the complaint, Vodzak reviewed Kropp's personnel file then called Kropp to discuss the incident. Id. at ¶¶ 38, 39. Kropp told her that Crosbie had exhibited this behavior multiple times, including in front of co-worker Andrea Woulard, id. at ¶ 39, and once in front of a person whose name "may have been Chris something." ECF 56-10 (Vodzak's Investigation Notes) at 2.

The next day, October 2, 2018, Vodzak called Crosbie, who denied the claims against him. Highmark Br. at ¶ 42. Crosbie told her that Kropp had a history of inappropriate behavior toward him. Id. Vodzak informed he that he would be suspended while she completed her investigation. Id. In response to Crosbie's comments about Kropp, Vodzak also spoke to Kropp's supervisor,

---

[2] Crosbie "dispute[s] that a proper investigation was ever conducted by Mrs. Vodzak," but he disputes only the quality of the investigation, not that Vodzak conducted one. Crosbie Br. at ¶ 36.

3

Jill Haer, and a Highmark Vice President with whom Crosbie had worked, Diana Rappa-Kesser, regarding Kropp and Crosbie's past interactions. Id. at ¶¶ 9, 35, 44. She also spoke to Burgess to inform him that Crosbie had been suspended. Id. at ¶ 45. At some point that day, Burgess spoke to Crosbie and described the call to Vodzak:

> Per Jim [Burgess], [Crosbie]'s personality causes him to "one up" you. The coughing, snorting, etc. [Crosbie] displayed [on their call] makes Jim believe he did it. If it wasn't for that, Jim would have questioned if [the complaint] was true.

ECF 56-10 (Vodzak's Investigation Notes) at 9. Finally, Vodzak spoke to Woulard, who said that she was present and had heard Crosbie make "an intentional pig snort" at Kropp, corroborating Kropp's story. Id. at 4; Highmark Br. at ¶ 46.

Following this information-gathering phase, Vodzak compiled her findings and recommended Crosbie's termination to her superior, Stacy Kitteridge. Id. at ¶ 47. Kitteridge made the ultimate decision to adopt the recommendation. Id. at ¶ 48. The next day, October 3, 2018, Vodzak called Crosbie to tell him he was terminated. Id. at ¶ 49.

Throughout this process, neither Vodzak nor Kitteridge was aware of Crosbie's FCA complaints. ECF 50-3 ("Gateway SOUF") at ¶¶ 97, 98.[3] Although Vodzak contacted Crosbie's second-level supervisor, Burgess, in the course of her investigation, Vodzak and Kitteridge were the sole decisionmakers who determined that Crosbie should be terminated. Highmark Br. at ¶ 52.[4]

---

[3] Crosbie denied Gateway's facts here only to the extent that he contends that Burgess also fulfilled a role as a decisionmaker. See ECF 62 at ¶¶97, 98. Crosbie has not identified any evidence in the record to dispute Vodzak or Kitteridge's ignorance of his FCA complaints.

[4] Crosbie's attorney conceded during the February 24, 2021 hearing that Burgess was not a decisionmaker. In his written submissions, Crosbie cites another employee's deposition, in which he "assume[d] [Burgess] was part of the discussion" but he admitted he did not know the nature or extent of that involvement. Parker Dep. (ECF 49-3) at 27:13–18. This same deponent also "d[id]n't know who ultimately made the decision to terminate Mr. Crosbie." Id. at 26:20–23.

### III.  Procedural History

Crosbie filed his initial complaint in March 2019, ECF 1, subsequently amended in June 2019, ECF 17.  The Court reviewed Gateway and Highmark's motions to dismiss, ECF 18, 19, and denied them both. ECF 27, Crosbie v. Highmark, Inc., No. 19-1235, 2019 WL 6530990 (E.D. Pa. Dec. 4, 2019) (Baylson, J.) ("Crosbie I").

Following discovery, Highmark and Gateway moved for summary judgment on November 30, 2020.  ECF 49, 50.  Crosbie did not respond to Defendants' motions within the required time period, and Defendants moved the Court to admit their statements of undisputed material facts as unopposed.  ECF 53.  Crosbie's attorneys responded that there had been unavoidable delays caused by the COVID-19 pandemic and several infections within their law firm.  ECF 54.  The Court, finding good cause for the delay, denied Defendants' request and gave Crosbie an extended opportunity to oppose.  ECF 58.

After these delays, Crosbie responded to the motions, ECF 56, 57, 62, and Defendants replied in support by January 12, 2021, ECF 63, 64.  The Court ordered oral argument, seeking further information on discrete issues in the briefs.  ECF 66.  On February 24, 2021, the Court held oral argument by telephone.  ECF 67.  Per the Court's instructions, the parties filed post-hearing briefing on March 3, 2021.  ECF 68–70.

### IV.  Legal Standard

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 248 (1986).  A factual dispute is "material" if it "might affect the outcome of the suit under the governing law."  Id.

A party seeking summary judgment "bears the initial burden of demonstrating the absence of any genuine issue of material fact."  Huang v. BP Amoco Corp., 271 F.3d 560, 564 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  The moving party can satisfy this burden by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 325.  After the moving party has met its initial burden, the adverse party's response must set out specific facts, and not mere allegations, showing a genuine issue for trial by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).  "[T]he non-moving party must make a showing sufficient to establish the existence of each element of his case on which he will bear the burden of proof at trial."  Huang, 271 F.3d at 564.

Under Rule 56, this Court must view the evidence presented on the motion in the light most favorable to the non-moving party.  Anderson, 477 U.S. at 255.

**V.    Analysis**

Crosbie claims that both Highmark and Gateway are liable for committing unlawful retaliation by allegedly terminating for his reporting of purported FCA violations, under 31 U.S.C. § 3730(h).  See Crosbie I, 2019 WL 6530990, at *3 (discussing claims).

Crosbie's claims of employment retaliation fall under a burden-shifting framework.  Even if the Court assumes that Crosbie can satisfy his initial burden for prima facie retaliation, it is undisputed that Defendants meet their responsive burden, by demonstrating a legitimate, non-retaliatory justification for his termination.  The Court will focus on the final prong — Crosbie must show that there is a genuine issue as to whether Defendants' harassment investigation was a

mere pretext for retaliation. Because there is no evidence connecting Crosbie's FCA reporting and the decision to fire him for workplace harassment, Crosbie cannot show that Defendants retaliated against him. As such, the Court will GRANT Defendants' motions for summary judgment.

    a) <u>Defendants as Crosbie's Employers</u>

Highmark contends that Gateway was Crosbie's sole employer, and, therefore, Highmark cannot be liable under the retaliation statute. Crosbie disagrees with Highmark; Gateway does not dispute that it was his employer for purposes of this statute. The record on the issue of "Highmark as Employer" is murky at best, but the Court need not determine Highmark's status here.

In <u>Crosbie I</u>, the Court held that "a plaintiff can have multiple employers for the purposes of an FCA anti-retaliation case," including circumstances like these "with two collaborating business enterprises." 2019 WL 6530990, at *4 (interpreting <u>Faush v. Tuesday Morning Inc.</u>, 808 F.3d 208 (3d Cir. 2015)). In determining whether an entity has a qualifying employer role, the Court applies the <u>Darden</u> factors, <u>id.</u> (citing <u>Nationwide Mut. Ins. Co. v. Darden</u>, 503 U.S. 318, 322 (1992)), chief among them are "which entity paid the employees' salaries, hired and fired them and had control over their daily employment activities." <u>Id.</u> (quoting <u>Faush</u>, 808 F.3d at 214).

Viewing the record evidence in the light most favorable to the nonmovant, it appears that Highmark and Gateway could both be liable under this statute. Gateway was Crosbie's initial hirer and paid his wages, and his direct supervisor (Pici) was a Gateway employee. Highmark contends that it only worked as a Human Resources contractor for Gateway, not as the employer for any of its workers. But Crosbie was also told to identify himself as a Highmark employee, and Highmark paid for his 401(k) and other benefits. He occasionally performed tasks at the direction of Highmark employees. Kitteridge, the ultimate decisionmaker who terminated him, worked for a

Highmark entity (although possibly not a Highmark entity named as defendant here, further complicating the relationship).

The relationships between Gateway, Highmark, and Crosbie are unclear. Because it is not dispositive here, the Court need not decide this issue now. For the present summary judgment motions, the Court will assume without deciding that both Highmark and Gateway were Crosbie's employers under 31 U.S.C. § 3730(h).

      b) <u>Legal Framework</u>

FCA retaliation claims fall under the <u>McDonnell-Douglas</u> burden-shifting framework.[5] First the plaintiff "must show . . . that (1) he engaged in 'protected conduct,' and (2) he was discriminated against because of his protected conduct" — that is, "his employer had knowledge he was engaged in 'protected conduct' and his employer's retaliation was motivated, at least in part, by the employee's 'protected conduct.'" <u>Crosbie I</u>, 2019 WL 6530990, at *3 (quoting <u>Hutchins</u>, 253 F.3d at 189 n.9). "Once the plaintiff makes out [his] prima facie case, 'the burden of production [then] shifts to the defendant to offer a legitimate [non-retaliatory justification] for the adverse employment action.'" <u>Burton v. Teleflex, Inc.</u>, 707 F.3d 417, 426 (3d Cir. 2013) (quoting <u>Smith v. City of Allentown</u>, 589 F.3d 684, 690 (3d Cir. 2009)). If met, "the plaintiff [must] provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination." <u>Id.</u> (citing <u>Fuentes v. Perskie</u>, 32

---

[5] Although the Third Circuit has not directly applied this framework in the FCA context, [i]n the Third Circuit, an evaluation of retaliation claims is typically governed by the <u>McDonnell Douglas</u> burden-shifting framework." <u>See</u> <u>New Jersey v. Haig's Serv. Corp.</u>, No. 12-4797, 2016 WL 4472952, at *9 (D.N.J. Aug. 24, 2016) (applying this framework to retaliation claim under the New Jersey False Claims Act); <u>see also</u> <u>Hutchins v. Wilentz, Goldman & Spitzer</u>, 253 F.3d 176, 186 (3d Cir. 2001) (briefly addressing FCA retaliation claims as requiring a burden-shifting framework). Additionally, all parties frame their arguments under the <u>McDonnell-Douglas</u> framework and do not dispute its applicability.

F.3d 759, 764–65 (3d Cir. 1994)).

  c) Whether Defendants Terminated Crosbie Based on a Pretext for Retaliation

The Court will assume without deciding that Crosbie can satisfy the first step. And, based on the record, it is undisputed that Defendants' justification — a Human Resources harassment investigation and termination decision — is legitimate and facially non-retaliatory. The burden would then shift back to Crosbie to show this was merely a pretext. The Court will focus its attention to this third step: Crosbie cannot survive summary judgment without evidentiary support that the harassment investigation was merely a pretext.

Crosbie relies on two basic arguments in support for a finding of pretext: (1) the investigation "failed to comply with the standard procedures followed by the human resources department in all of its other investigations" and (2) "Burgess not only knew about the protected conduct, but used Ms. Kropp's HR complaint as pretext to retaliate against Mr. Crosbie." Crosbie Br. at 32–33. Both arguments fail.

  i. Quality of the Investigation as Evidence of Pretext

The first argument can be disposed of summarily. Crosbie relies on an excerpt from Caplan v. L. Brands/Victoria's Secret Stores LLC, 210 F. Supp. 3d 744, 768 (W.D. Pa. 2016), for the proposition that "evidence that an investigation was utterly foolish, biased, or unsubstantiated could be probative of a retaliatory motive. . . ." Crosbie Br. at 35. But the full quote within the opinion tells a different story:

> While evidence that an investigation was utterly foolish, biased, or unsubstantiated could be probative of a retaliatory motive, proof that it was imperfect, unwise, or inaccurate would not. A challenge to the sufficiency or propriety of the investigation is inadequate to establish pretext.

Id. (collecting Third Circuit case law) (emphasis added and citations omitted); see also Money v. Provident Mut. Life Ins. Co., 189 F. App'x 114, 116–17 (3d Cir. 2006) (a "naked credibility attack"

on an employer's pre-termination investigation does not create inference of pretext). In fact, Caplan found that the challenged investigation's "failure to 'connect with' [the plaintiff] or her supervisor or coworkers in order to 'understand the context of the remark' or 'ask additional questions' cannot be probative of pretext." 210 F. Supp. 3d at 768.

The same applies here. Vodzak's decisions to interview Crosbie's second-level supervisor, instead of his direct supervisor, and to omit from her investigation the past interactions between Kropp and Crosbie likewise do not provide support for Crosbie's pretext argument. The investigation here was not "utterly foolish" or a mere sham; Vodzak discussed the event with several employees (including an eyewitness who corroborated Kropp's version of events) before coming to her conclusion.

Since there is no evidence that either Kitteridge or Vodzak knew of or had reason to retaliate against Crosbie for his FCA complaints or that the investigation was a mere sham, there is no room to infer that the investigation was deficient as a symptom of or a pretext for retaliation.

    ii.    Burgess' Involvement as Evidence of Pretext

Crosbie also argues that Burgess intended to retaliate against him for his FCA investigation and that the investigation relied on Burgess, thereby imputing his retaliatory intent. This argument is essentially a "cat's paw theory." Under this theory, actionable retaliation occurs where a "nonbiased decision-maker is influenced by a biased managerial employee." Durst v. Phila., 798 F. App'x 710, 714 (3d Cir. 2020).[6] An archetypical example of the cat's paw theory is where a biased employee falsely reports a coworker as retaliation and a nonbiased supervisor terminates

---

[6] Third Circuit precedent directs the court to "analyze[] plaintiff's cat's paw argument in the pretext step of the McDonnell Douglas framework." Afrasiabipour v. Pa. Dept. of Trans., 469 F. Supp. 3d 372, 386–87 (E.D. Pa. 2020) (DuBois, J.).

10

the subject because of that complaint. In that scenario, the employer imputes the retaliatory intent and, therefore, the liability.

Here, Crosbie argues that Burgess intended to retaliate against him for his FCA investigation; Kitteridge and Vodzak relied on Burgess' input in their investigation; and, therefore, his termination was a result of an unlawful, retaliatory motive. To succeed on this theory, Crosbie must show evidence that Burgess' "animus <u>proximately caused</u> the adverse employment action at issue in the case." <u>Afrasiabipour</u>, 469 F. Supp. 3d at 387 (quoting <u>Mason v. SEPTA</u>, 134 F. Supp. 3d 868, 874 (E.D. Pa. 2015) (McHugh, J.)). "[P]roximate cause is required in cat's paw cases, and that requires 'some direct relation between the injury asserted and the injurious conduct alleged' and excludes links that are 'remote, purely contingent, or indirect.'" <u>Jones v. SEPTA</u>, 796 F.3d 323, 330 (3d Cir. 2015).

But Crosbie cannot show proximate cause because Kitteridge and Vodzak relied on an independent investigation into his behavior.

In <u>Jones v. SEPTA</u>, the plaintiff argued cat's paw retaliation. <u>Id.</u> at 331. There, the plaintiff's supervisor initiated an investigation, allegedly as retaliation, and the independent Office of the Inspector General continued the investigation. <u>Id.</u> Even though the OIG interviewed her supervisor as part of its fact-gathering, the existence of an independent investigation — as opposed to one "where there was no evidence that the employer relied on anything besides the allegedly biased supervisor's say-so" — broke the link between the purported animus and the termination. <u>Id.</u>; <u>see also</u> <u>Macknet v. U. Penn.</u>, 738 F. App'x 52, 57 (3d Cir. 2018) (rejecting cat's paw liability for retaliation claim where decisionmaker interviewed allegedly biased employee but did not rely her recommendation). Where the investigation and termination decision are independent of the purported animus, "a reasonable jury could not find a causal link between [] allegations of

harassment and any adverse employment action" and the defendant should receive summary judgment. Jones, 796 F.3d at 331.

Here, Crosbie argues that Burgess, his second-level supervisor, wanted to retaliate against him and, because the investigation involved an interview of Burgess, the Court may infer the existence of a causal link here.

Crosbie relies on two cases and no record-based evidence in support.

In the first case, Moore v. Grove N.A., Inc., a supervisor (with purported hostility to the plaintiff) denied his involvement in her termination, but the defendant conceded in its briefs that the supervisor was one of two employees who "jointly decided to terminate her." 927 F. Supp. 824, 834 (M.D. Pa. 1996). In the second, Shellenberger v. Summit Bancorp, Inc., the plaintiff's supervisor (again the individual with purported hostility) was present in the meeting where plaintiff was fired. 318 F.3d 183, 189 (3d Cir. 2003). Her presence there, among the decisionmakers during the actual termination, "present[ed] circumstantial evidence that [the supervisor] was involved in the decision to terminate" the plaintiff. Id. These cases discuss when the court may infer the existence of a causal connection between an individual with a retaliatory motive and the decision to terminate the plaintiff. But the Court may not do so without evidence of that connection.

No comparable evidence is present here. Crosbie's argument is that Burgess tainted the investigation as a decisionmaker because the investigators spoke to Burgess. But Burgess did not make the decision to terminate Crosbie, he merely provided them information. See Footnote 4 (no evidence for Burgess as decisionmaker); see also Oliver v. Rhynhart, No. 18-279, 2019 WL 3943458, at *14 (E.D. Pa. Aug. 21, 2019) (Slomsky, J.) (manager was not "personally involved in

the decision to fire Plaintiffs" although she was "kept abreast" during termination decision).[7]

Based on the record here, Crosbie's termination more closely resembles that of Jones v. SEPTA: the investigators conducted independent interviews and fact-finding before concluding termination was the correct response to the complained-of conduct. Three key facts are undisputed here, and they show that there is no causal link between Crosbie's FCA investigation and his termination:

- Kitteridge and Vodzak made their termination decision based on an independent investigation that included two witnesses to Crosbie's workplace harassment.
- Kitteridge and Vodzak were the sole decisionmakers in terminating Crosbie.
- Kitteridge, Vodzak, and both witnesses were unaware of (much less retaliating because of) Crosbie's FCA complaints.

Without any causal connection between his FCA complaints and his termination, Crosbie cannot show that the harassment investigation was merely pretextual and, therefore, his claims cannot survive summary judgment.

## VI. Conclusion

For the reasons given above, the Court GRANTS Defendants' motions for summary judgment. An appropriate order follows.

O:\CIVIL 19\19-1235 Crosbie v. Highmark\19cv1235 Memo re MSJ.docx

---

[7] Crosbie even uses the same language that was rejected as defining a decisionmaker role in Oliver: "it is denied that Mr. Burgess was not involved in the decision to terminate Mr. Crosbie. In fact, this pretext is made all the more clear given that Mr. Burgess was kept abreast [during] the 'investigation. . . .'" Crosbie Br. at ¶ 52 (emphasis added).